UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No.   12 CR 87 |
| v. | ) | |
| | ) | Hon.   Sharon Johnson Coleman |
| RONALD WATTS | ) | |

### GOVERNMENT'S CONSOLIDATED MOTIONS IN LIMINE
### TO EXCLUDE AND ADMIT CERTAIN EVIDENCE AT TRIAL

The UNITED STATES OF AMERICA, by and through its attorney, GARY S. SHAPIRO, United States Attorney for the Northern District of Illinois, hereby respectfully moves this Court for entry of an order excluding and admitting certain evidence at trial as described in the following motions in limine:

1. Motion to Admit Non-Hearsay Statements of Co-Defendant
2. Motion to Preclude Argument or Evidence Designed to Elicit Jury Nullification;
   A. Defendant's Health or Family Circumstances
   B. Selective or Racially Motivated Prosecution
   C. Penalty for the Offense
   D. Motivation for Investigation or Prosecution of this Case
   E. Discovery Requests or Commentary on Discovery
   F. Evidence of Defendant's Lawfulness
3. Motion to Preclude Cross-Examination Based on Arrests;
4. Motion to Preclude Cross-Examination Based on and Convictions More than Ten Years Old;
5. Motion to Preclude Inquiry Into Underlying Details of Convictions;
6. Motion to Preclude Cross-Examination Based on Other "Bad Acts" of Witnesses; and
7. Motion to Preclude Argument Explaining or Defining Reasonable Doubt.

I.      Background

    A.      Factual Background

On November 21, 2011, Sergeant Ronald Watts and Officer Kallett Mohammed were assigned to the Chicago Police Department's 2nd District tactical team. That day, they planned and then conducted an operation to seize drug proceeds from a courier working for drug dealers who operated in the 2nd District. Watts and Mohammed knew when and where the courier would pick up the drug proceeds and the path the courier would take to deliver the drug proceeds. Shortly before 2p.m., Mohammed approached the courier, who was carrying a bag near the location where the courier was to deliver the proceeds. Mohammed took the bag, which contained $5,200 in U.S. currency. Mohammed did not arrest the courier, however. Instead, Mohammed met up with Watts, and they kept the $5,200 for themselves, which was their plan from the get-go.

On November 21, 2011, Watts and Mohammed stole $5,200 in funds belonging to the Federal Bureau of Investigation, and for that, they were charged in an information with theft of government funds, in violation of 18 U.S.C. § 641. Neither Watts nor Mohammed knew that the courier from whom they took the $5,200 was an FBI cooperating source (the CS).[1] Neither Watts nor Mohammed knew that the CS was acting at the FBI's direction. Neither Watts nor Mohammed knew that the FBI was recording their conversations with the CS, conducting surveillance of their

---

[1]      The government anticipates that the CS will testify at trial, but is refraining from referring to the CS by name in public filings until the time of trial.

2

activities, or gathering other evidence against them. The government will offer this evidence at trial to prove Watts[2] guilty beyond a reasonable doubt.

B.    Government's Evidence

At trial, the government's evidence will include the testimony of FBI special agents and law enforcement officers; the testimony of the CS; consensually-recorded telephone conversations and in-person meetings between the CS and Watts and Mohammed; surveillance video and photographs; pen register and toll data for the cellular telephones subscribed to and used by Watts and Mohammed; GPS location data for the cellular telephone subscribed to and used by Watts; vehicle registration information; CPD records; maps; and $400 given to the CS by Watts. The evidence will prove the following:

Several months prior to November 2011, the CS spoke with Watts in an unrecorded conversation. According to the CS, Watts wanted to know if anything was "going on." Watts told the CS that if the CS found out something was going to happen, the CS should call him or go to the station and ask for Watts or Mohammed. Based on the CS's prior dealings with Watts, including a prior instance where Watts and the CS engaged in a transaction similar to the charged offense,[3] the CS understood this to mean that Watts wanted to know when the CS would be transporting money for drug

---

[2]    Kallatt Mohammed has pled guilty to the information and has been sentenced.

[3]    The government has filed a separate Notice of Intent to Offer Evidence under Fed.R.Evid. 404(b).

3

dealers so that Watts could steal the money from the CS in exchange for a payment to the CS.

Thereafter, on November 18, 2011, the CS placed a recorded telephone call to Watts, who was using telephone number (773) 848-4761, which, according to phone records, was subscribed in the name of Ronald Watts ("Watts Phone 1").[4] During the ensuing conversation, after the CS confirmed that he was speaking to "Sergeant Watts," the CS told Watts, "I got one going on."[5] Watts responded, "When?" The CS said that it was going to happen no later than "Monday." Watts then said, "Make sure you call me."

On Monday, November 21, 2011, at approximately 12:45 p.m., the CS placed a recorded phone call to Watts, who was using Watts Phone 1. During the call, the CS told Watts, "It's gonna go on. I got to meet them at McDonald's on twenty-sixth." Watts confirmed that the CS was talking about the McDonald's near the intersection of 26th Street and Martin Luther King Drive in Chicago. The CS told Watts that he was going to pick up a bag from one car and walk it to another car on 29th Street. The

---

[4]     Where this summary of the evidence indicates that a call or meeting was recorded, the government intends to admit at trial the recorded call or meeting and a transcript of the recording.

[5]     The government will prove that Watts is the speaker in the recordings described herein based on the following evidence: (a) CS will identify the individual to whom he spoke as Watts, whose voice he recognized based on prior interactions; (b) during some of the recorded phone calls, the CS asks if he is speaking to "Watts" and Watts confirms his identity; (c) FBI Agents and/or CPD Officers who listened to the recordings will confirm that the same voice is speaking wherever a statement herein is attributed to Watts and that they recognize that voice to be Watts' voice based on their interactions with him; and (d) the phone is subscribed in Watts's name.

CS said that he was supposed to be at McDonald's in one hour.  Watts then told the CS that he was also going to be there in his car.

Pen register and toll records show that, a few minutes later, at approximately 12:49 p.m., Watts Phone 1 called telephone number (708) 527-7823, which, according to phone records, is subscribed in the name of Kallatt Mohammed ("Mohammed Phone 1").  The call lasted 2 minutes and 12 seconds.

A short time later, at approximately 12:55 p.m., the CS placed another recorded phone call to Watts at Watts Phone 1.  During the ensuing conversation, Watts asked the CS if the CS was "headed up that way now?"  The CS responded, "In a few minutes."  Watts then told the CS, "I'll be in the area."

At about 1:13 p.m., law enforcement dropped the CS off near the intersection of 26th Street and Martin Luther King Drive.  Prior to being dropped off, law enforcement conducted a search of the CS for the presence of excess paper currency with negative results and then equipped the CS with two concealed recording devices.

Pen register records for Watts Phone 1 shows that at approximately 1:15 p.m., Watts Phone 1 received an incoming call from Mohammed Phone 1, which lasted for 1 minute and 2 seconds.   Then, at approximately 1:32 p.m., Watts Phone 1 called Mohammed Phone 1, and the duration of the call was 9 seconds.  A few seconds later, Mohammed Phone 1 called Watts Phone 1, and this call lasted approximately 1 minute and 5 seconds.  Shortly thereafter, a third call was made by Watts Phone 1 to Mohammed Phone 1, which lasted 52 seconds.

At approximately 1:44 p.m., an undercover CPD officer, in the guise of a drug dealer delivering drug proceeds, approached the CS in a vehicle at the McDonald's restaurant located in the vicinity of 26th Street and Martin Luther King Drive in Chicago, and handed the CS a black bag containing $5,200. The bag also contained a court-authorized tracking device. The CS then walked south along Martin Luther King Drive, turned east on 29th Street, and then turned north on South Vernon Street.

Pen register records for Watts Phone 1 shows that Watts made two attempts to contact the CS between 1:47 p.m. and 1:56 p.m. The CS did not answer these phone calls because, during this time the CS, was supposed to be "transporting the drug proceeds" and was instructed by FBI agents not to answer the telephone.

At approximately 1:56 p.m., Mohammed approached the CS near 2795 South Vernon after parking a black, four-door Hyundai Azera bearing Illinois license plate 918 1182, registered to Mohammed at his home address.[6] Mohammed then took the bag containing $5,200 from CS. Pen register records for Watts Phone 1 shows that at approximately 1:57 p.m., about 1 minute after Mohammed seized the bag from the CS, Mohammed Phone 1 called Watts Phone 1 and the call lasted 7 minutes and 23 seconds.

At approximately 2:04 p.m., the CS placed a phone call to Watts at Watts Phone 1. The phone conversation was not recorded. However, the CS's portion of the

---

[6]    The government will admit a certified copy of Secretary of State records showing that the car was registered to Mohammed.

6

conversation was captured by the two recording devices concealed on the CS. During

the conversation with Watts, the CS said the following:

> Hey Watts, he told me to meet, he told me to meet him on,
> on 30th. He ain't gave me no, no money yet man. (Pause)
> Oh, okay. I mean, man, c'mon on now, I did everything
> right man. (Pause) Huh. (Pause) Okay, man. (Pause) on
> State? (Pause) Okay. By, by the El. How about White
> Castle or something? (Pause) Yeah (Pause). Man, c'mon be
> there now Watts, alright? But I'm going around, I'm going
> around the other way, cause, I... (Pause) I didn't see the, I
> didn't see the car that I was supposed to went to anyway, so,
> okay. So, I'm, but I mean I got to move from the El. (Pause)
> So, I got me somebody snatching me in the car or
> something. (Pause) I'm on my way right now. C'mon on
> don't do me now. (Pause) Okay, my man. I'm, I'm on my
> way, I'm on my way, I'm on my way.

According to pen register data, at approximately 2:06 p.m., Watts Phone 1 called

Mohammed Phone 1, and the call lasted about 1 minute and 17 seconds.

At approximately 2:08 p.m., surveillance observed vehicles registered to Watts

and Mohammed in the area of 5700 and 5800 South Princeton Avenue, Chicago,

Illinois. Surveillance observed a Cadillac bearing Illinois license plate G92 3987,

which is registered to Watts at his home address.[7] Shortly after surveillance observed

Watts's and Mohammed's vehicles in the same area, the Watts pen register records

show that Watts Phone 1 called Mohammed Phone 1, and the call lasted 6 minutes and

9 seconds.

About twenty minutes later, based on information obtained from the court-

authorized tracking device that had been placed in the bag, FBI agents recovered the

---

[7]     The government will also admit certified Secretary of State registration records.

bag that Mohammed had seized from the CS from an alley behind 5924 South LaSalle Street, which is approximately a half mile from the location where surveillance observed Watts's and Mohamed's vehicles.[8]

At approximately 2:29 p.m., the CS called Watts on Watts Phone 1. Only the CS's side of the conversation was captured by the recording devices. During this conversation, CS said the following:

> Hey, I'm right across the street from White Castle. What you in, what you in? (Pause) What, what? (Pause) You what? (Pause) Like, walk over there, like what? (Pause) Walgreens? This is White Castle. (Pause) Oh, oh okay, okay.

At approximately 2:42 p.m., the CS met with Watts in the parking lot of a Walgreens store near the intersection of 22nd Street and Canal Street in Chicago. As captured on the recording devices concealed on the CS, the CS said to Watts, "about time. ...Man I thought you was going to (UI)." Watts responded "No, never doubt brother, (UI). Who always takes care of you?" CS replied "You do, Watts." Watts then said "There's five large brother," and handed CS some cash, which the CS put into his pocket without counting.

A few minutes later, at approximately 2:54 p.m., the CS met with FBI agents and provided them $400 which, according to CS is the cash that the CS received from Watts. Agents searched the CS for the presence of additional paper currency with

---

[8]   Surveillance agents later observed Mohammed returning to his residence at approximately 2:42 p.m.

negative results.  The serial numbers of the bills comprising the $400 matched the serial numbers of currency comprising the $5,200 that Mohammed took from the CS.

II.     Motion to Admit Non-Hearsay Statements of Co-Defendant

The government moves to admit the non-hearsay statements of co-defendant Mohammed to the CS as Mohammed took the bag containing $5,200 from the CS. Specifically, as captured by the recording device concealed on the CS, the following exchange occurred:[9]

| | |
|---|---|
| Mohammed: | Where it at, where it at?  In the bag? |
| CS: | Grab the bag. |
| Mohammed: | Fuck it, I'm gone. |
| CS: | Sir. |
| Mohammed: | Get the fuck out of here. |
| CS: | Sir, can I get some money, sir.  Hey, hey, I thought you was going to give me some money. |
| Mohammed: | Get the fuck out of here. |
| CS: | Uh uh, c'mon.  I don't get no money? |
| Mohammed: | No, you don't get shit.  But meet...meet me over off King Drive. |

_____

[9]     The government will prove that Mohammed is the speaker in the relevant recordings based on: (a) CS's identification of the speaker as Mohammed, whose voice he recognizes from prior interactions with Mohammed; (b) the fact that Mohammed is clearly visible on the video recording of this conversation; and (c) CPD IAD Officers and/or FBI Agents who have listened to the recording will confirm that Mohammed is speaking wherever a statement herein is attributed to Mohammed.

| | |
|---|---|
| CS: | What? |
| Mohammed: | Meet me on King Drive. |
| CS: | Okay. |
| Mohammed: | 30th. |
| CS: | 30th, okay. |

None of these statements are offered for their truth, and therefore the do not implicate Fed. R. Evid. 801.[10]  Instead, Mohammed's statements to the CS consist of questions, verbal declarations, and orders, none of which are hearsay.  *See, e.g., United States v. Tuchow*, 768 F.2d 855, 868 n.18 (7th Cir. 1985).  These statements are relevant to establish Mohammed's knowledge of and participation in the plan to steal the "drug proceeds" from the CS.  They also explain and provide context for the statements of the CS and the actions that the CS took in response to Mohammed's orders, namely calling Watts and telling him what Mohammed had instructed the CS to do.

III.    Motion to Preclude Argument or Evidence Designed to Elicit Jury Nullification

The government respectfully moves this Court to preclude the defendant from arguing, pursuing lines of inquiry, or otherwise presenting evidence designed to elicit jury nullification.  A defendant may not suggest in any way that the jury should acquit the defendant even if it finds that the government has met its burden of proof.  As the Seventh Circuit has stated, "An unreasonable jury verdict, although unreviewable if it is an acquittal, is lawless, and the defendant has no right to invite the jury to act

---

[10]  Federal Rule of Evidence 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."

lawlessly. Jury nullification is a fact, because the government cannot appeal an acquittal; it is not a right, either of the jury or of the defendant." United States v. Perez, 86 F.3d 735, 736 (7th Cir. 1996); see also United States v. Sepulveda, 15 F.3d 1161, 1190 (2d Cir. 1993) ("Neither court nor counsel should encourage jurors to exercise [nullification] power . . . . A trial judge, therefore, may block defense attorneys' attempts to serenade a jury with the siren song of nullification.").

Although the government cannot anticipate each form of potential jury nullification argument or evidence in this case, the government moves to exclude the potential areas noted below, each of which is irrelevant to the elements of the crimes charged. The government seeks by this motion to preclude any argument or questioning, no matter what its form, that in effect "encourages [the] jury to acquit under any circumstances regardless of the applicable law or proven facts." United States v. Anderson, 716 F.2d 446, 450 (7th Cir. 1983).

A. Defendant's Health or Family Circumstances

While the government acknowledges that the defendant is permitted to introduce limited testimony regarding his background, the government moves in limine to preclude evidence and argument regarding the defendant's health and family so as to infer either a motive for defendant's criminal conduct or to invoke sympathies regarding the impact of a conviction upon the defendant or his family. Such evidence is irrelevant to defendant's factual guilt and is designed for no other purpose than to invoke improper appeals for jury nullification. See generally United States v. Dunkin,

11

438 F.3d 778, 780 (7th Cir. 2006). Accordingly, such evidence or argument is properly excluded.

B.      Selective or Racially Motivated Prosecution

Defendant should also be precluded from advancing forms of argument or questioning designed to interject issues of race or selective prosecution into this trial – such as, that the prosecution of this case was motivated by the race of the defendant. Permitting unsupported and improper argument or questioning of this nature in the presence of the jury risks irreparable prejudice and confusion of the matters at issue. See generally United States v. Andreas, 23 F. Supp.2d 835 (N.D. Ill Jul. 9, 1998) (Manning, J.) ("[T]he court will not tolerate any implicit or explicit attempts to interject impermissible references to race or national origin during the trial.") (citing Jarret v. United States, 822 F.2d 1438, 1443 (7th Cir. 1987)). Courts, after all, have long noted in an analogous context that "[a]ppeals to racial passion can distort the search for truth and drastically affect a juror's impartiality." United States v. Doe, 903 F.2d 16, 25 (D.C. Cir. 1990).

The law is similarly well-settled that "claims of selective prosecution must be raised prior to trial [and]. . . must be resolved by the court and not the jury." United States v. Infelise, 1991 WL 251654 at *1 (N.D. Ill.) (Williams, J.); United States v. Washington, 705 F.2d 489, 495 (D.C. Cir. 1983) ("[T]he issue of selective prosecution is one to be determined by the Court."). Of course, as a more general matter, it is also settled law that inquiries regarding the subjective intentions or motivations of a government agent are irrelevant to determining the factual guilt or innocence of a

12

defendant.  See, e.g., United States v. Goulding, 26 F.3d 656, 667 (7th Cir. 1994) (noting, even in the context of an entrapment defense, it was proper for the trial court not to "allow the defense to mount an inquiry into the mental states of the investigating officers since such an inquiry was irrelevant.").  At bottom, evidence bearing on the government's decision to prosecute is "extraneous and collateral" and thus must be excluded from trial.  United States v. Johnson, 605 F.2d 1025 1030 (7th Cir. 1979) (affirming the exclusion of evidence offered to show that the "indictment was a political instrument."); United States v. Berrigan, 482 F.2d 171, 174-76 (3d Cir. 1973) (affirming exclusion of evidence relating to "discriminatory prosecution").

C.     Penalty for the Offense

The penalty faced by a defendant is irrelevant to the jury's determination of guilt or innocence.  See, e.g., Shannon v. United States, 512 U.S. 573, 579 (1994) (jury should "reach its verdict without regard to what sentence might be imposed").  Consequently, as the Seventh Circuit has admonished, "arguing punishment to a jury is taboo."  See, e.g., United States v. Richardson, 130 F.3d 765, 778 (7th Cir. 1997); United States v. Lewis, 110 F.3d 417, 422 (7th Cir. 1997); United States v. McKenzie, 922 F.2d 1323, 1327 (7th Cir. 1991) ("the Sixth Amendment requires that a jury determine questions of guilt or innocence; punishment is the province of the Court").

The mere mention of any facts relating to a possible penalty or sentence to be faced by the defendant if he is convicted would be improper, and through this motion the government seeks to exclude them, as they are irrelevant.  Reference to the potential penalties faced by the defendant, or already imposed upon him, would only

13

serve the improper purpose of jury nullification.  See, e.g., United States v. Reagan, 694 F.2d 1075, 1080 (7th Cir. 1982) ("The authorities are unequivocal in holding that presenting information to the jury about possible sentencing is prejudicial.").

D.     Motivation for Investigation or Prosecution of this Case

Evidence bearing on the government's decision to prosecute is "extraneous and collateral" and thus properly excluded from trial.  United States v. Johnson, 605 F.2d 1025, 1030 (7th Cir. 1979) (affirming the exclusion of evidence offered to show that the "indictment was a political instrument"); see also United States v. Berrigan, 482 F.2d 171, 174-76 (3d Cir. 1973) (affirming exclusion of evidence relating to discriminatory prosecution).  In addition, inquiries regarding the subjective intentions or motivations of a government agent or deputy are irrelevant to determining the factual guilt or innocence of a defendant.  See, e.g., United States v. Goulding, 26 F.3d 656, 667 (7th Cir. 1994) (noting, even in the context of an entrapment defense, that it was proper for the trial court not to "allow the defense to mount an inquiry into the mental states of the investigating officers since such an inquiry was irrelevant").  Therefore, the government seeks to bar any argument or introduction of evidence about the motivation for prosecution or intentions of any government agent.

E.     Discovery Requests or Commentary on Discovery

The government respectfully moves to preclude the defendant from requesting discovery from witnesses or opposing counsel, moving the Court for such discovery, or otherwise commenting on discovery matters, in the presence of the jury.  Such requests from counsel in front of the jury are inappropriate and may create the impression that

14

one side has suppressed information as a means of seeking an unfair advantage. Any such requests would be ill-founded because discovery has already been tendered or is not subject to disclosure. In any event, these requests, if appropriate, can easily be made to the Court or opposing counsel outside the presence of the jury with no prejudice resulting to either side. Accordingly, the government moves that requests for discovery or comments relating to discovery be made outside the presence of the jury. See generally Thompson v. Glenmede Trust Co., No. 92-5233, 1996 WL 529693, at *2 (E.D.Pa. 1996) ("Rather than focus on the issues in the case, the jury may instead be misled by the irrelevant side issues of the discovery process. Therefore, the Court will not permit either party to refer to the discovery process in the presence of the jury at trial."). The government believes that this fair and sensible method should be employed here.

F.      Evidence of Lawfulness

This Court should exclude all evidence of defendants' lawfulness and/or non-corrupt conduct, except reputation or opinion evidence offered by character witnesses strictly in accord with the limitations of Federal Rule of Evidence 405(a).[11] Other than

---

[11]  Even evidence offered under Rule 405(a), of course, cannot include specific instances of good conduct:  it is limited to a description of the subject's reputation or to a brief statement of opinion, without support from specific instances of conduct.  See Advisory Committee Notes to Rule 405 (The rule "contemplates that testimony of specific instances is not generally permissible on direct examination of an ordinary opinion witness to character . . . .  [O]pinion testimony on direct in these situations ought in general to correspond to reputation testimony as now given i.e. be confined to the nature and extent of observation and acquaintance upon which the opinion is based.").

testimony from character witnesses fitting within the narrow confines of Rule 405(a), no such evidence is admissible.

In this regard, the law is clear: "A defendant may not seek to establish his innocence . . . through proof of the absence of criminal acts on [other] specific occasions." United States v. Scarpa, 897 F.2d 63, 70 (2d Cir. 1990) (excluding taped proof that defendants met regularly and did not discuss criminal activity). In this case, defendant may seek to introduce recordings on other dates in which he declined to engage in a similar scheme with the CS for various reasons. However, evidence of other lawful behavior is irrelevant because acts of honesty do not prove an absence of dishonest acts. See, e.g., United States v. Scaroa, 897 F.2d 63, 70 (2d Cir. 1990); United States v. Beno, 324 F.2d 582, 589 (2d Cir. 1963) ("Evidence of noncriminal conduct to negate the inference of criminal conduct is generally irrelevant."); United States v. Grimm, 568 F.2d 1136, 1138 (5th Cir. 1978) (upholding exclusion of evidence that used car dealer paid for some cars instead of stealing them).

To hold otherwise would be to eviscerate the carefully drafted limitations of Rule 405, which forbid proof of good character through evidence of specific acts where character is not an element of the charge or defense. See Beno, 324 F.2d at 584 and 587. Like Rule 403, Rule 405 is intended to prevent the series of wasteful "mini-trials" that would inevitably ensue if a defendant were allowed to pursue this irrelevant line of inquiry. The Advisory Committee Notes for Rule 405 conclude that proof of character by means of specific acts "possesses the greatest capacity to arouse prejudice, to confuse, to surprise, and to consume time." See, e.g., Grimm, 568 F.2d at 1136

16

(evidence of lawful transactions "could have complicated the case and confused the jury"). Thus, to the extent defendant intends to offer evidence regarding his character, this Court should permit him to do so only in accordance with the limitations of Federal Rule of Evidence 405(a).

IV.    Motion to Preclude Cross-Examination Based on Arrests

The CS has a number of arrests that date back to 1978. Evidence of prior arrests should be precluded under Fed. R. Evid. 609 and 608.

Fed. R. Evid. 609 allows for the admission of a witness's conviction for impeachment purposes under certain circumstances. For example, a felony conviction generally is admissible for purposes of impeachment. See Fed. R. Evid. 609(a). In addition, any conviction for a crime involving "dishonesty or false statement" is admissible for impeachment purposes, regardless of whether the conviction is for a misdemeanor or felony. Id. However, arrests are not admissible under Rule 609, and defendants should be precluded from inquiring into arrests of witnesses.

Similarly, arrests are not admissible under Federal Rule of Evidence 608(b). Rule 608(b) provides that specific instances of past conduct may be inquired into on cross-examination if and only if they concern the witness' character for truthfulness. Courts have not construed Rule 608(b) to permit cross-examination on prior arrests absent special facts bearing on the witness' character for the specific trait of truthfulness. Thus, in United States v. Dennis, 625 F.2d 782, 798 (8th Cir. 1980), the Eighth Circuit held that a witness may not be cross-examined about an arrest except where Rule 608(b) would permit inquiry into specific acts leading up to the arrest that

17

related to crimes of falsity--e.g., perjury, subornation of perjury, or false pretenses. See also United States v. Sellers, 906 F.2d 597, 603 (11th Cir. 1990). Unless defendant can demonstrate that the conduct underlying the arrest implicates a witness' character for truthfulness, defendants should be precluded from inquiring into the conduct.

V.    Motion to Preclude Cross-Examination Regarding Convictions More than Ten Years Old.

The CS also has criminal convictions that are more than ten years old. Evidence of prior convictions more than ten years old should be excluded under Fed. R. Evid. 609.

Federal Rule of Evidence 609 includes time restrictions on the use of prior convictions to impeach a witness. Rule 609(b) states that,

> Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is the later date, unless the court determines, in the interest of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect. However, evidence of a conviction more than 10 years old as calculated herein, is not admissible unless the proponent gives to the adverse party sufficient advance notice of intent to use such evidence to provide the adverse party with a fair opportunity to contest the use of such evidence.

Based on Rule 609(b)'s time constraint of ten years from the date of conviction or date of release, the government moves to prevent the defendant from introducing any evidence or eliciting testimony regarding the CS's convictions that are more than 10 years old, because they are too remote in time to have sufficient probative value to justify their admission into evidence.

18

VI.    Motion to Preclude Inquiry Into Underlying Details of Convictions

The government also moves to preclude any inquiry into underlying details of any of the CS's convictions.  Although the fact of a conviction may be admissible, provided the requirements of Rule 609 are met, the underlying details of the conviction are not.  See United States v. Castro, 788 F.2d 1240, 1246 (7th Cir. 1986); United States v. Zarattini, 552 F.2d 753 (7th Cir. 1977); United States v. Chaverra-Cardona, 669 F. Supp. 1445 (N.D. Ill. 1987).  In Castro, the Seventh Circuit upheld the trial court's restrictions on any inquiry into the details of a government witnesses' prior conviction.  In that case, the government witness testified on direct examination that he had a prior conviction for a drug offense.  Castro, 788 F.2d at 1245-46 at 758.  On cross-examination, the trial court prohibited defense counsel from going into the details of the drug conviction.  Id.  On appeal, the Seventh Circuit upheld the restriction:

> The court correctly limited cross-examination to the facts of the conviction rather than allowing counsel to explore the details.  A court should not permit counsel to explore the details of a witness' past conviction.

Id. (Citing United States v. Dow, 457 F.2d 246, 250 (7th Cir. 1972).  Accordingly, defendant should be precluded from inquiring into the details underlying the CS's prior convictions.

VII.   Cross-Examination Based on Other "Bad Acts" of Witnesses

Under Rules 611 and 608(b), a defendant is permitted to inquire into specific bad acts of the witness only if these acts are probative of truthfulness.  See, e.g., United States v. Van Dorn, 925 F.2d 1331, 1336-37 (11th Cir. 1991) (threats made by witness to judicial officers in a prior drug prosecution not relevant to a witness' truthfulness);

19

United States v. McNeill, 887 F.2d 448, 453 (3d Cir. 1989) (solicitation to commit a crime of violence is not probative of truthfulness); United States v. Bentley, 706 F.2d 1498, 1509-10 (8th Cir. 1983) (evidence of witness' involvement in drug operation not proper impeachment under Rule 608(b)); United States v. Fortes, 619 F.2d 108, 117-18 (1st Cir. 1980) (affirming trial court's refusal to allow cross-examination concerning witness' involvement in sale of cocaine on ground that selling cocaine is not probative of truthfulness or untruthfulness under Rule 608(b)); United States v. Young, 567 F.2d 799, 803 (8th Cir. 1977) (disallowing cross-examination of government witness concerning her alleged offer to pay $10,000 to have her husband killed, because "the proposed question was not relevant to veracity and honesty and would have been highly prejudicial"). Accordingly, the defendant should be precluded from inquiring into specific bad acts of a witness without first demonstrating how those acts are probative of truthfulness.

So that this Court may make the appropriate ruling, the defendant should identify prior to cross-examination any prior "bad act" about which they intend to cross-examine a witness and demonstrate how that conduct is probative of truthfulness. The defendant should be precluded from inquiring into any specific instances of conduct which are not relevant and probative of truthfulness or untruthfulness and whose probative value does not substantially outweigh their prejudicial effect.

## VIII.  Argument Explaining or Defining Reasonable Doubt

The Seventh Circuit has clearly and consistently held that "reasonable doubt" is a term that should not be defined by the trial court or counsel.  See, e.g., United States v. Blackburn, 992 F.2d 666, 668 (7th Cir. 1993) (noting that definitions of reasonable doubt have a likelihood of "confus[ing] juries more than the simple words themselves"); United States v. Bardsley, 884 F.2d 1024, 1029 (7th Cir. 1989); United States v. Glass, 846 F.2d 386, 387 (7th Cir. 1988) (explaining that "[a]ttempts to explain the term 'reasonable doubt' do not usually result in making it any clearer to the minds of the jury") (citations omitted); United States v. Hall, 854 F.2d 1036 (7th Cir. 1988) ("An attempt to define reasonable doubt presents a risk without any real benefit.").

In United States v. Thompson, 117 F.3d 1033 (7th Cir. 1999), the Seventh Circuit affirmed the district court's decision to prevent defense counsel from explaining reasonable doubt to the jury.  Explaining that "[t]he law is clear in this circuit that it is improper for attorneys to attempt to define the term," the Seventh Circuit noted that by preventing defense counsel's attempt to explain reasonable doubt, "[r]ather than abusing its discretion, the district court heeded our express command."  See also, United States v. Alex Janows & Co., 2 F.3d 716, 722-23 (7th Cir. 1993) ("It seems simple enough; we admonish counsel, do not define 'reasonable doubt' to a jury.").  The pattern jury instructions for the Seventh Circuit also make clear that it is inappropriate to define reasonable doubt.  Seventh Circuit Pattern Jury Instruction 1.04.

<u>CONCLUSION</u>

For the foregoing reasons, the government respectfully requests that the Court enter an order granting the motions to admit and exclude evidence as is specified herein.

Dated: July 1, 2013

Respectfully submitted.

GARY S. SHAPIRO
United States Attorney

By:    /s/   Margaret J. Schneider
Margaret J. Schneider
Megan Cunniff Church
Assistant United States Attorneys
219 South Dearborn Street
Fifth Floor
Chicago, Illinois 60604
(312) 886-2035